IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>AUSTIN JAMES MALLORY,<br><br>        Defendant. | Case No: 4:21-cr-00075<br><br><br><br>**DEFENDANT MALLORY'S SENTENCING MEMORANDUM** |

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 2

II.   FACTS ..................................................................................................................... 2

   A. Mallory is a good young man who had never been in trouble before this incident. ..... 2

   B. Mallory is innocent of what he was charged with regarding the May 10th incident. .... 4

   C. Mallory was not in the OTB gang and was not involved in any of the incidents before or after May 10th. ................................................................................................ 8

   D. The sentence Mallory has already received and served in State court for this very same incident is more than sufficient. ........................................................................ 9

III.  SENTENCE ........................................................................................................... 10

   A. Factual Objections to PSR .......................................................................................... 10

      1. May 10th Incident .................................................................................................. 10

      2. Incidents Before and After May 10th .................................................................... 10

   B. Sentencing Guideline Calculation ............................................................................... 11

      1. Base Offense Level ................................................................................................ 11

      2. Mitigation Role ...................................................................................................... 12

   C. Section 3553(a) Factors .............................................................................................. 13

IV.  CONCLUSION ...................................................................................................... 14

I.      INTRODUCTION

Austin James Mallory ("Mallory") is a good young man who had never been in trouble before this incident. He was a Boy Scout, a member of ROTC, a member of the high school swim team, an extremely hard worker, and a devoted family member. Yet, at 18 years of age, he found himself in a situation that has now changed his life forever. While he certainly is responsible for putting himself in that situation, it has now become clear that he was not in any gang; did not know who the victims were or wish them any ill will; and never possessed a gun, shot a gun, or even knew guns were in his car. Mallory is not a murderer and is not a bad person, quite the opposite. Accordingly, we are asking for a sentence of the mandatory minimum of ten years in prison.

II.     FACTS

A.      **Mallory is a good young man who had never been in trouble before this incident.**

Mallory was just 18 years old at the time of this incident. He grew up without his father and was raised by his mother. PSR ¶ 54. He lived on the southeast side of Des Moines with his mother, stepfather, and two younger sisters. *Id*. ¶ 69. Mallory is a good young man who is a hard worker, a responsible individual, a caring friend and family member, and someone who has never before been in trouble.

Mallory graduated from East High School just the year before the incident for which he was charged. During high school, Mallory was involved in several activities. He was a Boy Scout until the age of 16. ¶ 55. He was in ROTC until his sophomore year. ¶ 55. However, when he was 16 years old he began to work a lot. Immediately after turning 16 years old, Mallory began working 30-40 hours per week at Cash Savers from June 26, 2017 to December 10, 2017;

he then worked 20-30 hours per week at Papa Murphy's from January 18, 2017 to June 9, 2017; and then, he worked 30-40 hours per week at Pancheros from November 19, 2018 to March 26, 2019. Nonetheless, throughout high school, he was an active, dedicated member of the high school swim team. And, despite needing special education support, Mallory worked so hard in high school that he graduated a semester early – whereupon he then only took a brief break to travel to go meet his father for the first time, and then immediately went to work full-time. *Id*. ¶ 79.

Mallory's teacher at East High School provides unique insight in his letter of support: Dustin Cassler ("Cassler") was Mallory's teacher and swim coach throughout high school. Mallory required special education support in the areas of learning and behavior. However, he was well-behaved in high school and his behavior goal was dropped from his IEP. And despite struggling academically, Mallory worked hard and even graduated a semester early. Cassler describes Mallory as a "hard working student" who participated in school events and activities. Mallory stayed out of trouble and mostly hung out with the swimmers in high school. Cassler states: "Throughout my experience with Austin, I have always found him to be a very honest, respectful, reliable, hard working individual who would help anyone in need."

By way of explanation, Cassler provides the following description of Mallory:

> During the time Austin was on the East High School Boys Swim Team he was always a hard worker, even showing up to morning practices as a junior varsity swimmer when these practices were only required for varsity swimmers. Austin always attended practice and arrived on time. When we would have team events such as team dinners, Austin and his family would always participate. When we would work football concessions for fundraisers, Austin and his family would always volunteer to help, and Austin was one of our most hardworking reliable workers. Once Austin began driving he would often help in transportation for swimmers who did not drive. Austin always encouraged all of his teammates by walking along the pool and cheering them on during their races, and on more than one occasion helped with a few swimmers who had significant special needs. Although Austin was primarily on the junior varsity, he was still a big part of our

team makeup with his work ethic, reliability, enthusiasm, dedication, and always being a great teammate.

After graduating early from high school, Mallory worked full-time, had a girlfriend, and spent time with his family. As the letters from family demonstrate, family is very important to Mallory. As his mother states: "When Austin's younger sister started having medical issues he would take her to the movies or lunch because she struggled with friendships due to having seizures. Austin loves to help his friends and family. He enjoys camping, fishing, racing, and just being with his family." With respect to his relationship to his girlfriend, his girlfriend's mother describes him as "being amazing to her in every way."

After graduating a semester early from East High School, Mallory worked 45 hours per week at Swift Trails End Auto Recycling as an auto dismantler. The owner of the company and his boss, Mike Swift not only thought he was a "very good employee" and would like to hire him back, but also showed up to testify for him at trial. PSR ¶ 83. Mike Swift knows Mallory and knew he was not a gang member. *Id*. ¶ 55 Mallory worked 45 hours per week at Swift Trails End Auto Recycling from April 23, 2019 to January 12, 2021, when he went into custody and began serving his sentence.

At the time of this incident, Mallory had never been in trouble before and had absolutely no criminal history. PSR ¶ 48

  **B.**  **Mallory is innocent of what he was charged with regarding the May 10th incident.**

On May 10, 2020, Mallory made the fateful mistake of taking his friend from childhood, Braden Shafer ("Shafer"), to Merle Hay Mall. Along with Shafer, Mallory also picked up Shafer's friends: Raekwon Patton ("Patton"), Gerante Rankin ("Rankin"), and Tayronce Denton

4

("Denton"). Mallory picked these individuals up in his 2002 white Chevy Trailblazer, and they went to Shoe Carnival, where they met up with other individuals. The surveillance video from Shoe Carnival shows they arrived at approximately 4:32 p.m. The Shoe Carnival video then shows that Rankin and Patton left the store first at approximately 4:36 p.m., Mallory left by himself at around 4:38 p.m., and then, finally, Shafer and Denton left at approximately 4:50 p.m. Of particular note, as the Shoe Carnival video clearly shows, not only did Rankin and Patton leave before Mallory, but Mallory walked in with the car keys on a long black lanyard, and Rankin was the one who left with the car keys. The keys are later photographed by the DMPD in the ignition on the long black lanyard.

As Shafer and Denton left along with two other individuals, they apparently saw R.N. and A.D. arriving at the mall and hurried back to the Chevy Trailblazer. The Chevy Trailblazer followed the green sedan driven by R.N. and A.D. until they reach the 3100 block of Clark Street, where they were ambushed and had shots fired at them. Patton and Shafer are alleged to have fired shots as well. During the shooting, Shafer was shot in the head. The DMPD confirmed in their reporting that it believes the individual on the sidewalk is the person who shot Shafer. As they crossed 30th Street on Clark Street, DMPD Officer Curtis was going southbound on 30th Street, saw these events occurring, and immediately chased the Chevy Trailblazer down Clark Street.

The DMPD immediately became aware that someone in the back of the Chevy Trailblazer had been shot and expressed its belief that the Chevy Trailblazer was headed to Mercy Hospital. The Chevy Trailblazer headed straight for Mercy Hospital in short pursuit until the rear left tire on the Chevy Trailblazer blew out, and the Chevy Trailblazer stopped near Evelyn Davis park. The DMPD directed the driver to step out, and Mallory stepped out of the

driver's area. The DMPD then directed the rear passengers out of the car, whereupon Patton exited. Denton exited next, indicating that Patton was in the left rear seat, Denton was in the rear middle, and Shafer was on the rear right side by the window. The DMPD took Rankin out of the front passenger seat. The entire episode from the time Shafer and Denton left Merle Hay Mall to the time of the shooting at the 3100 block of Clark Street took approximately 7-8 minutes; it was only 3-4 minutes from the shooting to the time the DMPD stopped the Chevy Trailblazer at Evelyn Davis park.

Mallory was 18 years old at the time of the incident, had just graduated from East High School, had never been in trouble, and was not part of a gang. Following the arrests, the DMPD interviewed Mallory, and that interview lasted from approximately 11:15 p.m. until after 2:00 a.m. in the morning. Scared and not knowing what to say, he confirmed that he was driving the Chevy Trailblazer. The State of Iowa charged Mallory with Attempted Murder, and he pleaded guilty to Aiding and Abetting Intimidation with a Dangerous Weapon Without Intent (a Class D Felony). However, there was a surveillance video from 3114 Clark St., just one block before the shooting occured, that shows Mallory in the front passenger seat of the Chevy Trailblazer.

The Government's theory at trial was that Mallory drove Shafer and Patton in his Chevy Trailblazer to chase down rival gang members, R.N. and A.D., knowing they were going to attempt to shoot them, and that he did so apparently to increase Shafer's position in the OTB gang. However, the Government's evidence was limited to the following: Mallory drove the group in his vehicle to the mall and, when, the police stopped them, Mallory got out of the driver's area. In a DMPD interview immediately following the incident, Mallory subsequently took responsibility for driving. Mallory was childhood friends with Shafer and had known some of the other individuals through Shafer but was not in the gang. In fact, there was no evidence

presented that Mallory knew any of the individuals in the car were in a gang until after Detective George told him Rankin was a gang member. At closing, the Government relied almost exclusively on the DMPD interview.

There was no evidence presented at trial that Mallory knew about any guns in the car until after the shooting occurred. The only evidence the Government submitted in this regard was Mallory's statement to the police that he had seen a social media post previously where Shafer had a gun. However, this was not the gun in question because the evidence showed Shafer got that gun on the day of the shooting and there was no evidence that he posted anything about that gun. Nor was there any evidence of any threats, conversations, or anything else that would have led Mallory to know that Patton or Shafer were going to shoot at R.N. or A.D. The bottom line is that not only was Mallory not aware of the motivation or incidents leading up to the shooting, but he did not know about any guns in the car either. The Government's claim, citing to Govt. Ex. 413W, that Mallory said he realized Patton and Shafer had guns prior to the shooting is not accurate. Rather, throughout his interview with the DMPD Mallory maintains he never saw a gun or knew anyone in the car had a gun.

The DMPD interview excerpts the Government admitted into evidence do not establish that Mallory was driving the car at the time of the shooting. The only real evidence the Government mentioned in its closing – other than a few, insignificant messages with Shafer – was the interview where DMPD had gotten Mallory to state that he was driving. However, when read in context of the other evidence, it is clear that Mallory falsely claimed responsibility for driving at the time of the shooting to avoid retaliation from Rankin. The evidence at trial clearly established that Mallory was not driving at the time of the shooting. The Clark St. surveillance video shows Mallory in the front passenger seat just a split second before the shooting. Even the

Government's own witness, Denton, who was in the car, testified that Mallory was in the front passenger seat and Rankin was driving. In fact, though not admitted, Fabrece Turner, another one of the Government's witnesses, testified that Rankin told him he was driving and then switched with Mallory. Further, the Government's witnesses had no reasonable explanation for the video and could only speculate that there was a mysterious red glare on the window – a speculation that was clearly disproven by the lack of glare on other windows on that car, the lack of glare on other cars, and the glare being present through the video and from more than one angle. There is simply no getting around that Mallory was sitting in the front passenger seat when the shooting occurred.

As a matter of fact, the Government had no explanation for any of the exculpatory evidence that Mallory presented at trial. Ranking walking out first with the keys; Rankin getting into the driver's side of the car; Mallory's phone and mask in the front passenger's area; the jacket Mallory was wearing that matched the blood stain on the front passenger seat; and the Clark St. surveillance video showing Mallory in the front passenger seat. The Government either did not address or did not have an explanation for any of it in their closing argument. In sum, the only theory that is supported by all the evidence was that Mallory was not driving and switched with Rankin after the shooting.

### C. Mallory was not in the OTB gang and was not involved in any of the incidents before or after May 10th.

Despite the Indictment that was shown and read to the jury at the beginning of trial and that alleged Mallory was a member of OTB, there was no allegation or evidence at trial that Mallory was part of OTB. The Government has now finally conceded Mallory was not a member

of OTB. But there was no evidence that he even knew what OTB was, who was in it, and certainly not that he wanted to be in it.

The Government put on lots of evidence about the motivation for and events leading up to the May 10th shooting. However, Mallory was not a part of it and there was no evidence that he was even aware of it. The only evidence the Government put forward is Mallory being friends with Shafer and saying he was aware of Shafer's past – though never saying he was aware of any gang affiliation by Shafer. The Government also was allowed to introduce testimony that he was social media friends with some of the individuals involved in the shooting. However, there was no evidence that Mallory saw any of the posts or stories admitted at trial. Nor was there any evidence of Mallory talking about any gangs, let alone OTB.

Nor was Mallory a part of any alleged gang activity after May 10th. Mallory was released pretrial on July 17 and was out until January 12, 2020. Yet there is no evidence or even allegation that Mallory was part of any gang activity or anything else associated with the incident.

**D.     The sentence Mallory has already received and served in State court for this very same incident is more than sufficient.**

Faced with the charge of attempted murder, Mallory pleaded guilty to Intimidation with a Dangerous Weapon Without Intent. As part of that plea, he had to state that he was driving the car at the time of the shooting. However, he did not know there was evidence corroborating his innocence, *i.e.*, the Clark Street surveillance video. Mallory was expected to serve one year. The State was satisfied that this was justice. Mallory was on pretrial release from July 17, 2020 to January 12, 2020. Mallory was compliant on pretrial release. PSR ¶ 56. He has now served over 2 ½ years.

### III. SENTENCE

#### A. Factual Objections to PSR

Mallory's factual objections to the PSR fall into two categories: (1) those involving the May 10th incident; and (2) those involving the incidents before and after May 10th. Mallory's other objections were either resolved by way of amendment to the PSR or rejected by Probation as being matters that should not be included.

##### 1. May 10th Incident

Mallory objects to those paragraphs in the PSR that are inconsistent with the trial record and the facts in this case with respect to the May 10th incident. Specifically, we object to **PSR ¶¶ 13, 15, 16, and 19**. Mallory withdraws his objection to **PSR ¶ 20**. For the reasons set forth above, Mallory objects to these paragraphs and requests they be amended as we have provided.

##### 2. Incidents Before and After May 10th

Mallory objects to those paragraphs in the PSR that should not be included in his PSR. Specifically, he objects to **PSR ¶¶ 7-9, 10-12, 13** (incidents prior to May 10th) and **PSR ¶¶ 21-30** (incidents after May 10th). To be clear, Mallory is not contesting the factually validity of these paragraphs as he has no first-hand knowledge; rather, he merely is contesting their inclusion in his PSR. When Mallory objected to their inclusion in his PSR, Probation cited the following guidance:

> [T]he offense conduct is a concise but complete description of the defendant's conduct and the conduct of the co-defendants or other participants. It addresses all relevant conduct occurring during the offense of conviction, including the planning and preparation for the offense, and the circumstances leading to the arrest or summons of the defendant.

Administrative Office for the United States Court's Guide to Judiciary Policy, Volume Eight, Part D, Presentence Report, Chapter Three. While we are not able to find this resource and

acknowledge it is up to the Court's discretion, we would respectfully submit that these paragraphs be deleted from Mallory's PSR for the following reasons: First and foremost, these incidents were not part of Mallory offense. In fact, they are actually descriptions of other offenses that Mallory was not charged with in this case. Second, Mallory was not involved in those incidents; and he was not in the gang related to those incidents. Third, he is not even alleged to have been knowledgeable about those incidents and has no first-hand knowledge to form an opinion as to their factual validity. Finally, those incidents are not relevant conduct for Mallory and are not relevant to the Sentencing Guideline calculation in his case.

    **B.**    **Sentencing Guideline Calculation**

        **1.**    **Base Offense Level**

Mallory did not attempt to commit first degree murder and therefore his base offense level should be 27. *See* USSG §2A2.2. Mallory objects to the application of base offense level 33 under the Sentencing Guidelines. First, for the reasons set forth in his Motion for Judgment of Acquittal or New Trial, Mallory did not attempt to commit any murder. Second, the language in the jury instructions in this case did not require the same finding as that of "first degree murder," as required in USSG §2A2.2. The Guidelines define "first degree murder" as conduct that would constitute first degree murder under 18 U.S.C. § 1111. *Id*. That statute requires "malice aforethought" and a "specific intent to kill." *See* 18 U.S.C. § 1111(a). Mallory is not guilty of any premeditated killing and certainly never had the intent to kill R.N. or A.D. Third, while we understand the Court has ruled against us on this issue, we would respectfully like to preserve our appeal on the lack of inclusion of justification language in the jury instruction. We respectfully submit the lack of inclusion of this language prevented the jury from finding

Mallory guilty of first-degree murder. Accordingly, Mallory's base offense level should be level 27.

### 2. Mitigation Role

Mallory should receive a four-level mitigating role adjustment. *See* USSG §3B1.2. The Guidelines provide for a mitigating role reduction of 4 levels if the defendant was a minimal participant; 2 levels for a minor participant, and 3 levels if between the two. USSG § 3B1.2. The Guidelines set forth the following factors for the Court to consider in determining which level is appropriate:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;
(ii) the degree to which the defendant participated in planning or organizing the criminal activity;
(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
(v) the degree to which the defendant stood to benefit from the criminal activity.

USSG §3B1.3 n.3(C) (emphasis added).

Mallory does not meet any of these five factors. First, Mallory was not part of the OTB gang. Second, he did not participate in the planning or organizing of the shooting that occurred on May 10th. In addition to not driving, Mallory did not know R.N. or A.D., did not know what Shafer or Patton wanted with them, and did not know it was part of any gang dispute. No one testified that the plan was to shoot R.N. or A.D. and, certainly, no one testified that they told Mallory that was the plan. In fact, the Government has already conceded that R.N. and A.D. were the ones who set up an ambush on Mallory's car. Third, Mallory did not exercise decision making authority here as he was not even a member of the gang. Fourth, Mallory did not shoot

anyone, did not possess a gun; and, in fact, was not driving the car. Fifth, Mallory did not stand to benefit at all from this incident as he was not part of the OTB gang nor did he want to be part of the OTB gang. As a matter of fact, there was no evidence at trial that Mallory even knew what the OTB gang was, who was in it, or who were their rivals.

Accordingly, Mallory's adjusted offense level should be 23 and, with a criminal history level of I, his Guideline range should be 46-57 months plus the consecutive ten-year term of imprisonment pursuant to 18 U.S.C. § 924(c).

### C. Section 3553(a) Factors

The Guideline is an important first step of analysis, but it is "not the only consideration" when determining a proper sentence. *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 169 L.Ed.2d 445 (2007). While the Guideline "reflects a rough approximation of sentences that *might* achieve § 3553(a)'s objectives," *Kimbrough v. United States*, 552 U.S. 85, 109, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (emphasis added), the Court must conduct an "individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. This individual assessment allows for sentencing deviations from the Guideline where it would allow the Court to "impose a sentence *sufficient, but not greater than necessary*" to achieve § 3553(a)(2)'s goals of retribution, deterrence, incapacitation, and rehabilitation. *Kimbrough*, 552 U.S. at 111.

The factors the Court is required to consider in determining the appropriate sentence are, in relevant part, as follows: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence imposed, including the need to reflect the seriousness of the offense, the need for deterrence and the need to protect the public; (3) the kinds of sentences available; (4) the Guideline range; (5) any applicable policy statements; (6) the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct; and (7) the need to provide restitution to the victims. *See* 18 U.S.C. § 3553(a).

This case boils down to 7 minutes in the life of a good young man who had never been in trouble before in his life. On May 10, 2020, he gave a friend he knew from childhood and had recently reconnected with, a ride to the mall along with several of that individuals' friends, some of whom he had met before. But he was not part of any gang and was not ware that they were part of a gang either. Nor did Mallory ever possess a gun, let alone shoot a gun, or even know there were guns in the car. Rather, all that is alleged to have occurred is that at some point in that 7 minutes he should have known what was going to happen and stopped it. The next three minutes he spent taking his childhood friend to the hospital. He then took responsibility for something he did not do.

In addition, in attempting to prevent unwarranted sentencing disparities, we point out that Co-Defendant Jordan Marie Wilkerson received a sentence of 83 months. She was convicted of the same two offense Mallory has been charged with and is alleged to have done at least as much, if not more, as was alleged of Mallory.

Lastly, the Court is required to consider the costs of incarceration. As set forth in the PSR, the costs of incarceration in this case for a ten-year sentence will likely be at least a half-million dollars, especially given inflation and taking into account future costs. The cost of a 20-year sentence would likely be close to a million dollars.

## IV. CONCLUSION

In conclusion, we request that the Court granted Mallory's Motion for Judgment of Acquittal or New Trial; in the alternative, we request that the Court sentence Mallory to ten years in prison, two years of supervised release, and no fine or restitution.

| | |
|---|---|
| Dated August 12, 2022 | **FAEGRE DRINKER BIDDLE & REATH LLP** |
| | /s/ Nick Klinefeldt |
| | Nicholas A. Klinefeldt, AT0008771 |
| | David Yoshimura, AT0012422 |
| | 801 Grand Avenue, 33rd Floor |
| | Des Moines, IA, 50309 |
| | Telephone: (515) 248-9000 |
| | Fax: (515) 248-9010 |
| | Email: *Nick.Klinefeldt@Faegredrinker.com* |
| | *David.Yoshimura@Faegredrinker.com* |
| | |
| | ***ATTORNEY FOR DEFENDANT MALLORY*** |

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August, 2022, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

/s/ Paulette Ohnemus

US.351740611.01

15